ADAMS, ADMINISTRATRIX *v.* BALTIMORE TRANSIT
COMPANY, ET AL.

[No. 33, October Term, 1953.]

296

*Decided December 4, 1953.*

*Motion for rehearing, filed December 30, 1953, denied January 8, 1954.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*George L. Clarke* and *Everett L. Buckmaster,* with whom were *D. Franklin McGinnis* and *Buckmaster, White, Mindel & Clarke* on the brief, for the appellant.

*Hamilton O'Dunne* and *Benjamin C. Howard,* with whom was *Edwin T. Steffy* on the brief, for the Baltimore Transit Company, appellee.

*Thomas M. Jacobs, Assistant City Solicitor of Baltimore City,* with whom was *Thomas N. Biddison, City Solicitor,* on the brief, for the Mayor and City Council of Baltimore, appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a judgment entered for the appellees as a result of the sustaining of demurrers filed by the appellees to the second amended declaration of the appellant, Charlie B. Adams. The Baltimore and Ohio Railroad Company, hereinafter called the Railroad, one of the original defendants, made settlement with the appellant and it is no longer a party to this case.

For the purposes of the demurrers we will consider as true all allegations well pleaded. The first count of the declaration and the particulars alleged the following. The defendant, appellee, the Baltimore Transit Company, hereinafter called Transit Company, on or about January 22, 1948, was a public carrier engaged in Baltimore City in the business of transporting passengers for hire and in operating and maintaining transportation facilities. The Railroad on said date was engaged in Baltimore City in the business of owning or leasing property for revenue and profit and operating a railroad for the transportation for hire of persons and property. The appellee, the Mayor and City Council of Baltimore, hereinafter called the City, on and about said date, was a municipal corporation of the State of Maryland. The plaintiff, Charlie B. Adams, appellant here, was an employee of the Maryland Drydock Company, hereinafter called the Drydock Company, who was transported by the Transit Company as a paying passenger in going to and from his place of work at the Drydock Company.

On or about the date aforesaid and for a long time prior thereto, the Transit Company and the Railroad maintained tracks and operated their transportation facilities in and through the City of Baltimore and more particularly in the vicinity of the public highways, Sun Street and Frankfurst Avenue in Baltimore under franchises granted by the City. Frankfurst Avenue runs east and west and is intersected by Sun Street which runs north and south. The entrance to the property of

the Drydock Company was on the north side of Frankfurst Avenue and west of Sun Street. The Drydock Company on said date and for a long time prior thereto employed numerous persons, including the plaintiff. These persons required transportation to and from the Drydock Company and their homes which were located in various parts of Baltimore and its environs. On or about the same date and for a long time prior thereto the Railroad maintained tracks and operated trains over and across Sun Street, a public highway, and also over land on each side of Sun Street, which was adjacent and parallel to and on the south side of said Frankfurst Avenue. Said tracks ran east and west and parallel to Frankfurst Avenue. The Railroad owned a narrow strip of land, about one hundred feet in width, adjacent and parallel to and on the south side of the tracks of the Railroad. A number of years prior to the date aforesaid the Railroad and the Transit Company entered into an agreement for their mutual benefit and profit under which the Transit Company erected and maintained on said narrow strip of land of the Railroad transporattion facilities among which were tracks over which it operated its cars and a waiting station, about fifty feet from Sun Street, near the said Railroad tracks. The said narrow strip of land of the Railroad on which said tracks, waiting station and other facilities were located was subject to the joint control of the Transit Company and the Railroad. In entering into said agreement it was the intention of both the Railroad and the Transit Company for the Transit Company to provide transportation for the numerous employees of the Drydock Company in going to and from their homes and place of work. Both the Railroad and the Transit Company knew or intended that such employees, on the date aforesaid and for a long time prior thereto, habitually and customarily would have to cross over the said tracks of the Railroad on Sun Street in going to and from the said waiting station and the said premises of the Drydock Company. On the date aforesaid and for at least twenty-

five years prior thereto the general public also habitually used Sun Street as a public way, route and street over and across the said tracks of the Railroad.

On or about the date aforesaid and for a long time prior thereto the Railroad frequently left long trains blocking and obstructing Sun Street and for long distances on either side thereof, "to wit, for one-half mile or more on either side thereof, for long periods of time, to wit, for many hours at a time". The said trains obstructed the passage of pedestrians so that in order for said employees of the Drydock Company to go to and from their said place of employment and the said waiting station it was necessary for them to pass and climb between the cars of such standing trains and, on or about said date and for a long time prior thereto, said employees customarily and habitually would pass and climb between the cars of such standing trains for said purposes. All of the defendants knew or should have known of the aforesaid dangerous condition created by the blocking and obstructing of Sun Street and of the said custom and necessity of said employees of passing and climbing between the cars of the standing trains of the blocking Railroad and that such crossing was an unsafe place and dangerous to the said employees and other members of the public using it. The Railroad and the Transit Company, by entering into said agreement with the knowledge and intention aforesaid, and the Transit Company, by the erection, maintenance and use thereunder of the said waiting station and other transportation facilities on the said property of the Railroad, under the conditions herein described, created a cul-de-sac in that, by letting off said employees of the Drydock Company at the said waiting station, the Transit Company let them off at a place from which the only reasonable way of ingress and egress for said employees of the Drydock Company, including the plaintiff, desiring to go between the said waiting station and the Drydock Company, was to climb through the cars of the Railroad which were blocking and obstructing Sun

Street as aforesaid. The said cul-de-sac thus created on or about the date aforesaid and for a long time prior thereto was a dangerous place into which the said employees including the plaintiff were let off by the Transit Company. There was nothing to prevent the plaintiff from going south on Sun Street. However, he could not reach his place of employment by so doing. All the defendants including the plaintiff and other employees of the Drydock Company had to cross the tracks of the Railroad and Sun Street to reach their place of employment although they knew or should have known that the said tracks were wrongfully blocked and obstructed as aforesaid. The Railroad Company and the Transit Company by said agreement between them and the Transit Company by erecting and operating its cars and waiting station thereunder and the City by permitting Sun Street to be illegally and wrongfully blocked as aforesaid invited employees of the Drydock Company including the plaintiff, on or about the date aforesaid and for a long time prior thereto, to cross over the Railroad tracks at the place aforesaid and to go between the standing train of the Railroad which blocked said Sun Street. Said employees including the plaintiff, in response to the invitation and knowledge of all the defendants, customarily and habitually did climb between the cars of the standing trains to go from the waiting station to the Drydock Company. On or about the said date, the plaintiff, as a paying passenger, rode to work on a street car of the Transit Company and was let off by it at said waiting station into said cul-de-sac at about 7:30 A.M., which was the time when many employees of the Drydock Company, to the knowledge of all the defendants, customarily and habitually crossed the said tracks of the Railroad at the place aforesaid in going to their place of employment. At that time trains of the Railroad were illegally and wrongfully blocking and obstructing Sun Street and for one-half mile or more on either side thereof for a period of several hours where the employees crossed. There was no indication when

said trains would be moved. The plaintiff believed because of past practice of the Railroad that said train would block said crossing for a long period of time. In order to get to his place of employment in response to said invitation of all the defendants, the plaintiff had to walk approximately seventy-five feet and go between the cars of the standing train and there was no other reasonable way for the plaintiff to go to his said place of employment from the said waiting station. While so going between said cars, in the exercise of due care and without any negligence on his part contributing thereto, and without any protection or warning being given him by any of the defendants, the plaintiff was caused to be suddenly and violently struck, thrown to the ground and dragged by a train of cars of the Railroad and to be seriously and permanently injured when the locomotive owned and operated by the Railroad in a careless, reckless and negligent manner violently and suddenly struck and put into motion the cars between which the plaintiff was passing. As a result of the negligence and want of due care of the defendant the plaintiff suffered serious and permanent injuries. The Transit Company had no other waiting station within one-half mile of the one where the appellant alighted.

The declaration further alleged that the Transit Company as a public carrier owed plaintiff and other employees of the Drydock Company as paying passengers in going to and from his or their place of work the duty of exercising the highest degree of care for their safety. It was the duty of the Transit Company to provide a safe place for the plaintiff and said employees to alight at said waiting station and a safe way of ingress to and egress from said waiting station across the said tracks of the Railroad at Sun Street. In breach of this duty the Transit Company regularly let off the plaintiff at said waiting station into the said cul-de-sac, and failed to provide a safe way across the tracks of the Railroad where it knew or should have known that the plaintiff would be in danger unless, as was its duty, it provided

proper and adequate warning and made adequate arrangements with the Railroad for his safety. The Transit Company negligently operated, managed and maintained its transportation facilities so as to endanger the plaintiff. It negligently failed to provide adequate warning or to make adequate arrangements with the Railroad for the protection of the plaintiff.

By Section 4 of Article 39 of the Baltimore City Code of 1927, (now Section 3 of Article 29 of the Baltimore City Code of 1950), the Railroad was prohibited from obstructing said Sun Street. The Railroad owed the plaintiff the duty of giving him adequate and timely warning of any movement of its standing cars. The Railroad blocked said Sun Street and negligently failed to provide watchmen or to give plaintiff any notice of the movement of said train.

It was the duty of the City to keep and maintain the public highways and crossings of Baltimore City in such a manner that the same would be safe for the public. In violation of this duty the City negligently and carelessly permitted the Transit Company and the Railroad to create said dangerous condition in the vicinity of Sun Street and Frankfurst Avenue on the date aforesaid and for several years prior thereto. By Section 6, Subsection 29 (d) of the Baltimore City Charter, the City is required to regulate and keep open for the traveling public said streets, including Sun Street. Sub-section 25 of Section 6 of the Baltimore City Charter requires the City to regulate the use of the streets by street railways and railroads. Sections 159 and 165 of the Charter requires the City to exercise and control all matters connected with the franchises granted by it to the Railroad and the Transit Company. The City negligently failed to keep Sun Street, on the date alleged and for a long time prior thereto, unobstructed by trains and negligently failed to require the Transit Company and the Railroad to provide a safe way of ingress and egress for the plaintiff across the tracks of the Railroad. The City negligently acquiesced in and permitted said

condition to exist on the date alleged and for many years prior thereto. When they knew or should have known and by exercise of due care could have prevented the plaintiff from sustaining the injuries alleged, the City, Transit Company and Railroad negligently created said dangerous condition. The City by its franchises and permissions did allow the Transit Company and the Railroad to create and maintain this dangerous condition.

The allegations of the second count of the declaration are substantially the same as the first count except that the asserted liability of the defendants is predicated upon the theory of nuisance. Under this count all the defendants are alleged to have jointly created, permitted and maintained the nuisance, that is, the illegal and wrongful blocking of Sun Street by the standing trains of the Railroad.

The City in answering interrogatories took the position that Sun Street terminated one hundred and forty feet south of the Railroad. The allegations of the third count are substantially the same as the first count except, on account of the position taken by the City and to enable the pleadings to support whatever evidence might be presented at the trial, the scene of the mishap is stated as being on a private way or path habitually and customarily used by employees of the Drydock Company in going between the waiting station of the Transit Company, across the tracks of the Railroad and to the Drydock Company. The third count alleges also that there was "no public highway crossing said tracks of the Railroad within one-half mile of the said waiting station".

We will first consider the demurrer filed by the Transit Company. The primary question is whether it was the duty of the Transit Company, under the allegation in the declaration, to provide a safe way for Adams, appellant, to cross the tracks of the Railroad between the Transit Company's waiting station and the premises of the Drydock Company. The appellant contends that by locating its waiting station as it did, for the purpose

of increasing its business in transporting large numbers of employees of the Drydock Company, the Transit Company knew or intended that the employees must cross the Railroad tracks and impliedly invited them to do so and therefore it was the duty of the Transit Company to provide these employees with a safe way across the Railroad tracks. Of course, the allegation of implied invitation is a conclusion of the appellant based on the concrete facts alleged. He relies on *Sheridan v. Baltimore & Ohio R. R. Co.*, 101 Md. 50. It was said in that case that the Railroad in permitting the crossing of its stalled cars impliedly invited the appellant to cross between the cars. That case might be authority for the liability of the Railroad here but not of the Transit Company. The appellant also relies on the fact that he was discharged on the private property of the Railroad. This property, however, was rented to the Transit Company and he was let off the car, according to the allegations before us, within fifty feet of a street. When he reached that point in safety, the obligation of the Transit Company ceased. He therefore was not discharged in a cul-de-sac. In the case of *Topp v. United Railways Co.*, 99 Md. 630, cited by appellant, it was held that a suburban electric railway company was liable for discharging a passenger in an unsafe place on its own premises. As there held, it is, of course, true that the Transit Company owed the plaintiff the highest degree of care while on its own premises. *Dilley v. Transit Co.*, 183 Md. 557, and cases there cited. However, here the unsafe place was on the Railroad premises. Appellant was discharged by the Transit Company in a safe place and could have left the waiting station without crossing the Railroad tracks. In *Pierce's Ex'x. v. B. & O. R. R. Co., et al.*, 99 W. Va. 313, 128 S. E. 832, relied on by the appellant, the plaintiff was killed in leaving defendant's railroad station in a taxi-cab on railroad tracks on a public highway which was "the only mode of egress from the station". A similar case is *Powell v. Phila. R. R. Co.*, 220 Pa. 638, 70 A. 268.

In *Carter v. Rockford & I. R. Y. Co.,* 147 Wis. 86, 132 N. W. 598, the railway was held liable for injuries sustained by a passenger while he was walking down steps from its platform. The top step was partly on its right of way. The remaining steps were wholly on the street. There, the only way to reach the street from the platform was by means of the steps or by going down a steep bank. The case of *Schlessinger v. Manhattan Ry. Co.,* 98 N. Y. S. 840, held that a railway company had the duty toward its passengers to exercise reasonable care in affording them safe approaches to the stations and platforms. In *Washington A. & Mt. V. Ry. Co. v. Vaughan,* 111 Va. 785, 69 S. E. 1035, it was necessary to pass along a public highway from the place where the passenger alighted to the station building. In the instant case, in leaving the Transit Company waiting station. there was a safe passageway to Sun Street. In *Cotant v. Boone Suburban Ry. Co.,* 125 Iowa 46, 99 N. W. 115, most heavily relied on by the appellant, a third person erected a defective stile to provide a passage over a fence separating the railroad company's right of way from adjoining property. To the knowledge of the railroad its passengers used this stile, which was the only reasonable means of egress from the railroad's grounds. The railroad was held liable there for injuries sustained by one of its passengers using the stile. That case is distinguishable from the instant one for the reason that the Railroad tracks here were not on the land leased by the Transit Company and there was a safe means of egress to Sun Street.

In *Terre Haute, Indianapolis & Eastern Traction Co. v. Auler,* (1934), 206 Ind. 423, 188 N. E. 572, the Traction Company established a regular stop at Maryland Place for the purpose of letting off and taking on passengers on signal. There were other stops within one quarter of a mile north and one quarter of a mile south of Maryland Place. In order to reach the highway from this waiting station it was necessary to cross a ditch. Someone placed a plank across this ditch which projected a

few feet on the Traction Company's land. This plank was used regularly by all persons who boarded and left the cars at the Maryland stop both in the daytime and at night. The claimant had knowledge of the plank and had used it in crossing to the highway on prior occasions. The Court held in that case that they knew of no authorities which required a carrier to maintain the public ways approaching its premises, unless it had established such ways and exercised supervision over it. Finding that the plank across the ditch was not put there by the defendant, it was said: "If it could be said that appellant was responsible for the character of way across the side-ditch adjoining its right of way, why not a like responsibility for the means of crossing the side-ditch on the opposite side of the highway, and why not for the safety of the highway itself as a passageway for pedestrians? *Quimby v. Boston & Maine R. Co.*, (1879), 69 Me. 340." In *Baier v. Cleveland Ry. Co.*, (1937), 132 Ohio St. 388, 8 N. E. 2d 1, the passenger alighted from a streetcar and in crossing the street adjoining the stop was injured. After reviewing many authorities, that Court said: "The substance of these holdings is that a street railway company is not an insurer of the safety of its passengers; that such company must necessarily discharge its passengers into the street; that the employees on the streetcar owe no duty of warning a departing passenger against the dangers of street traffic over which they have no control; that it is exclusively within the power of the passenger to fix the moment when he shall alight from the car; that the hazards of street traffic are as obvious to the passenger as to the employees of the company; that the responsibility of the company should not be extended beyond its practical control, and that since the railway company has no connection with vehicular traffic in the street, the failure of its employees to warn an alighting passenger of the danger from such source has no causal relation to the passenger's injury therefrom, the passenger having the same opportunity as the employees,

or a better opportunity to survey the surroundings and act for his own protection." *Kieger v. St. Paul City Ry. Co.*, 216 Minn. 38, 11 N. W. 2d 757; *Hensley v. Braden*, 262 Ky. 672, 91 S. W. 2d 34; *Conroy v. Boston Elevated Co.*, 188 Mass. 411, 74 N. E. 672; *Smuzynski v. East St. Louis Ry. Co.*, 230 Mo. App. 1095, 93 S. W. 2d 1058; *Lee v. Boston Elev. Ry. Co.*, 182 Mass. 454, 65 N. E. 822. In *Hempton v. Green Bay & W. Ry. Co.*, (1916), 162 Wis. 62, 155 N. W. 927, it was held that where a passenger used a short cut to the train, which had to some extent been traveled by passengers as a backway, the defendant railroad had extended no expressed or implied invitation to its passengers to use this passageway and was not required to light or guard the way. In *Smith v. N. O. Ry. & Light Co.*, (1922), 150 La. 1070, 91 So. 514, it was held that a walk adjoining streetcar tracks on the neutral ground of a street which was not maintained as a way for pedestrians and which was obviously intended to be used by employees operating a switch, was not an invitation to the public to use this walk in boarding streetcars. In *Cooke v. Elk Coach Line, Inc.*, (1935), 37 Del. 120, 180 A. 782, the plaintiff was struck by an automobile while crossing a street immediately after alighting from a bus. The Delaware Court there held that it was the duty of the operator of the bus to exercise reasonable care to see the place selected for the discharge of passengers is safe for that purpose. From the moment the plaintiff alighted from the bus at a spot safe for alighting, the defendant had no control over her movements. The relation of carrier and passenger ceased and the plaintiff assumed the status of a pedestrian. In *Creamer v. West End St. Ry. Co.*, (1892), 156 Mass. 320, 31 N. E. 391, it was said: "But one who steps from a street railway car to the street is not upon the premises of the railway company, but upon a public place where he has the same rights with every other occupier, and over which the company has no control. His rights are those of a traveler upon the highway, and not of a passenger."

In *St. John v. Connecticut Co.*, 103 Conn. 641, 131 A. 396, it was held that the streetcar company owed a duty to the passengers to not only secure for them a safe place in which to alight but also the duty to provide them passage to a point beyond any danger. It was, however, there held that the duty did not extend to the protection of a passenger who had safely alighted from a car from the effects of the negligence or wrong-doing of a third party. Under the authorities hereinbefore cited, we are of opinion that there was no duty on the part of the Transit Company to provide a safe way for Adams, the appellant, to cross the tracks of the Railroad between its waiting station and the premises of the Drydock Company.

As hereinbefore set forth, the essential difference between the allegations of the first and third counts is that Sun Street terminated 140 feet south of the Railroad tracks. In the particulars filed to that third count the appellant admits that there was nothing to prevent the plaintiff from reaching Sun Street safely. For the same reasons as stated as to the first count of the declaration, we do not believe that under the allegations of the third count there was any liability on the Transit Company.

As to the second count, the appellant contends that by locating its waiting station at a place to and from which the only reasonable way of ingress and egress was frequently wrongfully blocked by trains of the Railroad for many hours at a time, the Transit Company participated in the creation and maintenance of a public nuisance. We having previously held that there was another reasonably safe ingress and egress to the street, the only question here presented is whether the Transit Company participated in the creation and maintenance of the public nuisance by the trains of the Railroad blocking the entrance to the Drydock Company premises. It was said by this Court in *Walter v. Wicomico County*, 35 Md. 385, at page 390: "Before an action can be maintained against a party who has not erected the

nuisance, it must be established that he either failed, *after request,* to remove it, or has done some act to continue it. * * * From these authorities, and we believe there is not a single one to the contrary, it is very clear that a failure to remove a nuisance erected by another does not alone constitute a continuance of it. There must be some active participation in the continuance of it, or some positive act done evidencing its adoption. As argued by the counsel for the appellees, the rule is not that the nuisance continues, but that *the person continues it."* In the demand for a bill of particulars filed by the Transit Company, the following question was asked: "What control, if any, is it alleged that this Defendant had over the movements of trains or cars of the Baltimore and Ohio Railroad Company or over the movements of pedestrians, including the Plaintiff, undertaking to cross the tracks of The Baltimore and Ohio Railroad Company?" To this question the appellant answered: "None, but it was the duty of the Transit Company, when it located its waiting station on the property of the Railroad Company, to make adequate arrangements for the Plaintiff's safety." It being definitely stated that the Transit Company had no control over the movements of the cars of the Railroad, it, of course, did not create the nuisance by moving the cars across the entrance to the premises of the Drydock Company and had no participation in the continuance of it.

As to the liability of the City, appellant in the first count of the declaration alleges that the Railroad was operating on a franchise. In the second count he alleges that the City permitted the Railroad to operate across Sun Street without a franchise. He relies on Section 165 of the Baltimore City Charter, Flack, 1949, which provides that when a franchise is granted, the City shall reserve the right and duty at all times to exercise in the interest of the public full municipal regulation and control over all matters connected with said franchise; on Section 6, Sub-section 29, which re-

quires the City to regulate the use of streets and public ways by persons, animals and vehicles; on Section 6, Sub-section (29A) (d), which requires the City to prevent obstructions of any public or private streets; and on Section 6, Sub-section 25, which gives the City the power to control and regulate the use of streets by street railways and railroads. He claims that the City is liable under the franchise. He also claims that by failing to compel the Railroad to keep Sun Street open a nuisance was created and the City is liable in negligence for the injuries thereby sustained.

The Baltimore City Charter, Section 530, provides in part: "The duties of the Police Commissioner hereby created shall be as follows: * * * prevent and remove nuisances in all the streets and highways * * * and also to enforce all laws, ordinances of the Mayor and City Council of Baltimore, not inconsistent with the provisions of this sub-division of this Article. * * *" Section 563 of the Baltimore City Charter, which has been in effect at least since 1888, provides: "Nothing in this sub-division of this Article shall be so construed as to destroy or diminish the liability or responsibility of the Mayor and City Council of Baltimore for any failure to discharge the duties and obligations of said Mayor and City Council of Baltimore, or any of them, or give the said Mayor and City Council of Baltimore any control over said Commissioner or any officer of police, policeman or detective appointed thereby." By the Act of 1867, Chapter 367, the Legislature took the police department of Baltimore City out of the hands of the City and put it under control of the State. The power to pass ordinances in regard to the prevention and removal of nuisances is in the Mayor and City Council but they are deprived of the power of enforcing them. The enforcement is the duty of the police department which is under the control of the State. *Altvater v. Balto.,* (1869), 31 Md. 462, 466; *Sinclair v. Balto.,* (1883), 59 Md. 592; *Taxicab Co. v. Balto.,* (1912), 118 Md. 359; *Green v. Balto.,* (1943), 181 Md. 372; *East*

*Coast Lines v. Balto.*, (1948), 190 Md. 256, 272-273. The City cannot be held responsible unless it produced the condition in the streets resulting in injury. *Gutowski v. Balto.*, (1916), 127 Md. 502; *East Coast Lines v. Balto.*, supra. Of course, if the City produces a condition in the streets resulting in the injury it is liable as held in the cases of *Balto. v. Thompson*, (1937), 171 Md. 460, and *East Coast Lines v. Balto.*, supra. We have been referred to no case which holds that a City is liable in tort for failure to properly control or regulate a franchise, or that such failure amounts to a participation in the creation of a dangerous condition in highways. It is not alleged and could hardly be claimed that the franchise, which allowed the Railroad to operate, specifically allowed it to continuously block Sun Street with its cars. It is not alleged here that the City had any control over the movements of trains of the Railroad. The alleged violation of duty on the part of the City is failure to correct the dangerous condition created by the Railroad in so placing its cars. That is the duty of the police department. We must therefore hold that, as the City did not produce the condition of blocking Sun Street with the cars, it cannot be held responsible.

In *Baltimore v. Thompson*, supra, and in *East Coast Lines v. Baltimore*, supra, the City was held liable for the unsafe conditions which it had created, which conditions do not exist in the instant case. In those cases it was held that the City had produced the obstructions, of which it had sufficient notice, that it was reasonably foreseeable that these would endanger persons using the highway while in the exercise of reasonable care, and therefore it was liable by failing to take the precaution of warning such persons of the danger by some reasonable adequate means. Here, of course, the appellant knew of the obstruction of Sun Street by the cars of the Railroad, which were visible to him before he attempted to go through them. *Buczkowski v. Canton R. R. Co.*, (1943), 181 Md. 377. As the City did not create the obstruction in Sun Street, we find that it

was not liable under the allegations here. It is not necessary that we decide whether the appellant was guilty of contributory negligence as a matter of law or whether the sole proximate cause of the injuries was the action of the Railroad in moving the cars without warning. The judgment will be affirmed.

*Judgment affirmed, with costs.*